## Howard Ship Yards & Dock Company v. Boone.

### (Decided May 1, 1923.)

### Appeal from McCracken Circuit Court.

1. Brokers—Evidence Held Not to Show Broker was Procuring Cause of Sale.—Evidence that the purchaser of property had requested his banker to obtain a price on the property, that the banker directed plaintiff to obtain the price and the latter attempted to do so, but obtained no price because he refused to disclose the name of the prospective purchaser, and that his offer, made on behalf of the banker for the property, was rejected, held insufficient to warrant the jury in finding that he was the procuring cause of a sale of the property made directly to the purchaser.

2. Brokers—Promise to Pay Commission After Sale was Made Without Aid is not Binding—The owner's promise to a broker after sale effected without his assistance to pay a commission was without consideration and unenforceable.

WHEELER & HUGHES for appellant.

MOCQUOT, BERRY & REED for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

On October 4, 1920, the Howard Ship Yards & Dock Company sold to the Ayer & Lord Tire Company certain property in Paducah known as the Paducah Marine Rail-

way Company for $40,000.00.  Claiming that he effected the sale, Frank C. Boone brought this suit to recover a commission of five per cent on the purchase price.  From a judgment in his favor for the full amount sued for, this appeal is prosecuted.

A proper understanding of the case will necessitate an extended statement of the evidence.

Appellee's evidence is as follows: About the first of September he had information that there was a purchaser for the Marine Ways and asked Captain Mike Williams, their manager, if the property was for sale, and what they wanted for it.  Williams told him that he did not know, but to take the matter up direct with Clyde Howard.  The next morning he wrote to Clyde Howard. Not hearing anything in the next day or two, he went to Jeffersonville and asked Howard if the property was for sale.  Howard said that he reckoned they would sell it, but they had an option out on the property, and he could not give witness an answer for two or three days.  He then asked Howard if the option did not go through and he sold the property, would he make him an offer, with the understanding that he would add five per cent to the purchase price as his commission, and Howard said that would be satisfactory.  Howard then asked who was the purchaser, and he told Howard he was not in a position to give him an answer.  Howard said that he might be able to give him some information concerning the option next day.  The next day he rang Howard up from Louisville, and Howard told him that they had nothing on it. Howard further said he would write him in the next two or three days, and that in the meantime he should discuss the matter with Captain Williams at Paducah.  The matter went on for two or three weeks.  He wrote letters and sent a telegram, but got no answer.  He then asked Captain Williams to notify Howard that he understood that Russell Lord was going to Jeffersonville to buy the property direct, and that he was the man to whom he expected to sell the property.  Captain Williams then went to the telephone, called up Howard and delivered the message, then turned from the 'phone and said that Mr. Howard told him he understood that and would take care of his commission.  Afterwards the property was sold for $40,-000.00, and he made demand on the company for the money.  On his first visit to Jeffersonville Mr. Howard told him to discuss the matter with Captain Williams.

On cross-examination appellee stated that he never talked to the Ayer & Lord Tie people about the purchase of the marine ways. He wrote to Clyde Howard about August 13th that he had a prospect from reliable parties for a location for dry docks or ways, and wanted to know if his property was for sale, and if such was the case, and the price, which was to include a five per cent commission, was not exorbitant, and he would give a ten-day option, he was satisfied that he could effect an immediate sale. On September 9th he sent the following telegram: "My party offers $43,000.00 and inventory on stock. You pay commission. Wire reply today, myself or Utterback," but he received no reply either to the letter or telegram. In giving this evidence he told all that he had done. Howard asked him who his party was, and he told him that he was not in a position to give him the name of the party. Appellee's evidence concludes as follows:

"Q. But as a matter of fact you did not have any parties at that time? A. I thought I had a purchaser. Q. You did not have any authority to speak for anybody? A. I was told to get an option on it. Q. And you told him you had a prospective purchaser? A. Yes, sir. Q. But as a matter of fact you did not have anybody? A. I thought I did. Q. Who did you think you had? A. There was another party I was figuring for; I was to get it for other people. Q. Who did you think you had? A. I did not know the name of the other man. Q. For whom were you speaking? After they would not answer your letter on the 9th of September, you say you sent this telegram: 'My party offers forty-three thousand and inventory on stock; you pay commission; wire reply today myself or Utterback.' Who were you talking about? I had authority to send that telegram. Q. Who was your party; who were you talking about? (Objection by attorney for plaintiff. Objection overruled by the court. Exception by attorney for plaintiff.) A. J. C. Utterback. Q. Did you mean to tell the jury that Utterback was trying to buy the marine ways? A. I was authorized to offer that much money? Q. It was not sold to Utterback. A. I could not tell you. Q. You could not tell to whom it was sold? A. Ayer-Lord Tie Co. Q. You was speaking for Utterback, representing him? A. He was the man I was going to deliver it to. Q. You had authority from him. A. I had authority to close the trade at those figures. Q. And for Mr. Utterback? A. I don't

know whether it was for him; if I could have bought it I was going to deliver it to him. Q. You got your authority from him? A. Yes, sir. Q. You never disclosed that to Mr. Howard? A. No, sir. Q. Had you been up to Louisville before you sent this telegram? A. I had been to Jeffersonville one trip. Q. Who were you talking about when you went to Jeffersonville, when you told Mr. Howard you had a prospective purchaser? A. The same party I was representing all the way through. Q. You say you went to Jeffersonville before this telegram was sent, and you told Mr. Howard you had a prospective purchaser, now, who was that? A. I suppose the Ayer-Lord Tie Company. Q. Did you know that then? What did you mean by telling him you had a prospective purchaser? A. I thought I had a chance to sell it and I wanted an option. Q. To whom did you expect to sell it? A. Ayer-Lord Tie Company. Q. What information did you have that you could sell it to them? A. I understood upon very good authority they wanted to buy it. Q From whom did you learn they wanted to buy it? A. From two or three people. Q. You got it from Utterback? A. He talked to me about it once. Q. Who else did you get it from? A. It was talked around they wanted to buy this property. Q. Can you name anybody else? A. At the present I cannot. Q. None of the Ayer-Lord Tie people talked to you about it? A. I heard them discussing the purchase of the marine ways in the lobby of the City National Bank, I overheard it, but that was not what I acted on. Q. Was it the Ayer-Lord Tie people? A. There was two or three talking. Q. You just heard a casual conversation. A. Yes, sir. Q. You have narrated all the services you performed in this connection? A. Yes, sir.

"Re-direct—By Hon. W. A. Berry—Q. You got your information from Mr. Utterback? A. Yes, sir. Q. And he represented the Ayer-Lord Tie Company? A. I think he did. Q. What makes you think so? A. By his talk with me, he said if I bought it he could sell it.

"Re-cross—Q. What did he say that led you to believe you could sell it. A. Well, I presume— Q. What did he say? A. He said the Ayer-Lord Tie Company are after the marine ways. Q. Is that all he said? A. I cannot tell you just the exact words because I don't recall all of the conversation. Q. After that Mr. Utterback authorized you to buy it for him when you sent this telegram? A. I did not understand he was buying it.

Q. He authorized you to make the offer in his name? A. I offered that in my name. Q. You say Utterback was the party who authorized you to make this $43,000.00 offer? A. Yes, sir. Q. Then he did authorize you to make it. A. He did and I expected to deliver it to him. Q. You did not sell to Utterback? A. No, sir. Q. And it was not sold to Utterback? A. No, sir.''

Captain Mike Williams testified as follows: "He was formerly in the employ of the Howard Ship Yards & Dock Company as superintendent of marine ways. He had three conversations with Clyde Howard in regard to the Frank Boone matter. In his first conversation over the 'phone, he told Howard to deal direct with Boone. Howard talked about the place being for sale, and said that Boone had been up there and discussed the matter with him, but that he could not give him any answer because he did not know who the purchaser was. Howard told witness to find out from Boone who the purchaser was, and Boone would not tell him just then. After that he called up Howard again and told him that Boone could not tell who the purchaser was, whereupon Howard said that he could not name a price on the plant without knowing who he was. After that he informed Mr. Boone what Howard had said. Finally Boone came to him and told him the prospective purchaser was the Ayer-Lord Tie Company. Boone kept pressing him and then he called up Mr. Howard again and told Howard that Boone was there and requested him to tell Howard that his commission must be taken care of. He repeated this to Mr. Howard and Mr. Howard said that he understood this and that the commission would be taken care of. This conversation occurred along in October. On cross-examination he stated that he got the information that the Ayer-Lord Tie Company was the purchaser from Utterback. The conversation which he had with Howard in reference to Boone's commission was about the middle or latter part of October.

J. C. Utterback, president of the City National Bank, testified as follows: Representatives of the Ayer-Lord Tie Company came to his office and said that they wanted to purchase the marine ways and asked him if he had any way of getting information as to whether it was for sale, and the price, etc. He replied that he thought he could get the information for them. He then told Mr. Boone what he had learned and asked him to go and find out if the property was for sale, get a price on it and report

back to him. After Boone came back he told Miss Baker that he had sent Boone up there to try to get an option on the plant, but there was already an option on it, and Captain Berry and Miss Baker told him that a man by the name of Cline had an option on it for $45,000.00. He then told Miss Baker and Captain Berry not to buy at that figure. The matter dragged along for quite a while, when Mr. J. B. Lord came into the office and had a talk with him. Lord was chairman of the board of directors of the Ayer-Lord Tie Company. Witness told Lord that if he would go direct to Howard he believed Lord could buy the property for $40,000.00. Witness then told Boone that he had advised Mr. Lord to go and deal direct with the Howard people. After that, the Ayer-Lord Tie people bought the property through Captain Berry. On cross-examination he stated that the Ayer-Lord Tie Company kept its account at his bank, and was one of their most valued customers. At the request of that company he asked Mr. Boone to get the information, but the Ayer-Lord people did not authorize him to employ Boone to get the information. When in Louisville, he had a talk with Mr. Howard and told him that if they wanted to sell their ways, the party Mr. Boone had been talking to them about was a live one; that if he wanted to sell, to wire confirmation, and he did wire.

Clyde Howard, of the Howard Ship Yards & Dock Company, gave the following evidence: He was connected with the Howard Ship Yards & Dock Company and represented his company in selling the property to the Ayer-Lord Tie Company, which was represented by Captain Berry. On one occasion Boone came to see him about the sale of the ways, and he told Boone he was not in a position to discuss the matter with him at that time. Boone called a second time, and he then told Boone that he could not discuss the matter until he knew the name of his purchaser, which he never disclosed. After that he never saw Boone any more. However, Boone wrote to him, but he did not answer his letter. He told Boone that Mike Williams was their representative at Paduach, but not clothed with any authority to handle any deals regarding the sale of the ways. Mike Williams had three conversations with him over the 'phone about the matter. The last conversation took place the first week in October. Williams stated over the 'phone that, in the event of the sale of the ways, Mr. Boone would expect a commission.

He told Mr. Williams that he did not consider Boone entitled to any commission, that the ways had already been sold. Mr. Williams replied that Boone was claiming a commission. Witness then replied that he reserved the right to take care of that and handle it from his end of the line. In his interviews with Boone, Boone said that if he sold the ways he would want a commission of five per cent. To this witness made no reply, but told Boone that he could not discuss the matter until he knew his purchaser. Boone never told him who the purchaser was. Before Mr. Boone came to him, he knew that the Ayer-Lord Tie Company desired to purchase the property and had had conversations with them many months prior to October 4th. He never knew that Boone was speaking, or pretending to speak, in behalf of the Ayer-Lord Tie Company. The first that he ever heard of Boone's representing the Ayer-Lord Tie Company was in the conversation with Captain Williams. On cross-examination he said that when Boone came to see him the first time, he told Boone that he had an option out on the property. This option was probably given some time in August. In the last conversation over the 'phone Captain Williams told him that Boone would expect a commission if he sold to the Ayer-Lord Tie Company, and that that company was his prospective purchaser.

Captain W. L. Berry testified that he closed the deal between the Ayer-Lord Tie Company and the Howard Ship Yards & Dock Company for the purchase of the ways. He was then manager of transportation for the Ayer-Lord Tie Company and the chief officer in the state. He identified the contract dated October 4, 1920, and which had been previously admitted, as the one executed by him, and said that it bore the correct date. Several months prior to September 1, 1920, he, as representative of the Ayer-Lord Tie Company, had made inquiries looking to the purchase of the property, and that information had been communicated to the Howard Ship Yards & Dock Company. He spoke to Mr. Utterback about the matter and asked him to get a price on the property. This was done at the suggestion of Mr. Lord. He thought that Mr. Utterback was in a position to get the information as the Howard Ship Yards & Dock Company carried its account at his bank. So far as he was concerned, he did not give Mr. Utterback any authority to represent the Ayer-Lord Tie Company in the purchase of the property.

Summarizing the evidence, the facts are these: Representatives of the Ayer-Lord Tie Company, who were already acquainted with the property, asked Utterback, who was president of the bank in which the company kept its deposit, to find out at what price the property could be bought. Utterback asked Boone to get the information. Boone wrote to Cylde Howard, but received no answer. He then went to Jeffersonville and asked Howard if the property was for sale. Howard said that he reckoned they would sell it, but they had an option out on the property, and that he couldn't give Boone an answer for two or three days. Using Boone's own language Boone then said:

"In case that option don't go through and then I sell it, will you make me an offer on the property, with the understanding whatever price you make you will add five per cent on the purchase price as my commission, and he said that would be satisfactory. Then he said, 'Who is your purchaser,' and I said that I was not in a position to give him that answer. He said he might be able to give me some information concerning the option the next day. I went back to Louisville and rang Mr. Howard up the next day from Louisville and asked him about it, and he said, 'No, I have nothing on it,' he said, 'I will write to you in the next two or three days, and in the meantime you discuss the matter with Captain Williams at Paducah.'" When asked who was the party who offered $43,000.00 for the property as stated in his telegram to Howard, he said that he thought he had a purchaser, and finally admitted that J. C. Utterback was the person about whom he was talking, and to whom he expected to deliver the contract if he got it. After that he had Captain Williams call up Howard and tell him that Mr. Lord was coming up there to buy the property direct, and that Lord was the one to whom he expected to sell the property. Williams did call him up and Howard said that he understood that and would take care of his commission. At the time this conversation took place, the property had already been sold.

We are unable to find any ground on which the judgment may be sustained. In attempting to find out at what price the property could be bought Utterback acted solely for the accommodation of the purchaser. In seeking the information through Boone, Boone was his agent, and at no time was he the agent of Boone. Boone never introduced the purchaser to the seller, never showed the

property to the purchaser and never said one word about the property to the purchaser. The nearest he ever came to having anything to do with the sale was when he overheard a representative of the purchaser discussing the matter with some one else. In view of these facts, it is clear that Boone was not the procuring cause of the sale.

But it is insisted that appellant became liable because of Mr. Clyde Howard's statement over the 'phone to Captain Williams. On this question Captain Williams' testimony is as follows:

"Q. When you told Mr. Howard over the 'phone that Boone said his commission would have to be taken care of when he sold, what did Howard say? A. When I called his attention to Mr. Lord coming up there, Frank Boone was standing by the side of me and told me what to tell Howard, and I told him what Frank Boone said that in case he closed a deal with Mr. Lord his commission was to be taken care of, and Mr. Howard answered back he understood that and it was all right."

Mr. Howard's account of the same conversation is that when Captain Williams told him that Boone was claiming a commission if Howard sold the property to the Ayer-Lord Tie Company, his reply was that he reserved the right to take care of and handle that from his end of the line. Since, at that time, the property had already been sold without any assistance whatever from Boone, it is more probable that Captain Williams misunderstood the conversation than that Howard promised to pay for services that had never been rendered. But assuming, as we must for the purpose of determining whether a peremptory should have gone, that Howard used the precise language testified to by Captain Williams, what then was its legal effect? As Boone had had nothing whatever to do with bringing about a sale of the property, the agreement to pay him a commission if the Ayer-Lord Tie Company bought the property was simply a promise to pay something for nothing, and was therefore without consideration. Having this view of the case, it follows that the court should have directed a verdict in favor of appellant.

Judgment reversed and cause remanded for proceedings consistent with this opinion.